The Honorable United States Court of Appeals to the First Circuit is now in session. All persons having any business before this honorable court may draw near, give their attendance, and they shall be heard. God save the United States of America and this honorable court. Good morning. Please be seated. As the litigants know, both Judges Thompson and Stahl, who will not be asking questions this morning, will nevertheless participate in the deliberations and decision in this case as they have up to this point. Chief Judge Howard, the case today is number 161492, Mark W. Eves v. Paul R. LePage. May it please the court a good morning. My name is David Webber. I'm here with my co-counsel, Harold Garvin. And with the permission of the court, I'd like to give you four minutes for rebuttal. Yes. I'd like to begin by emphasizing three sets of major concessions that I think really simplify and narrow the case for the Honorable Court. First of all, I want to emphasize our concessions about what we're not challenging and not claiming is an adverse action. We're not claiming or challenging, for example, the governor vetoed bills. Many of the allegations in the complaint are in there solely as evidence of motive but have nothing to do with the adverse actions that were alleged. So in no way are we asking for relief from the court from the governor deciding to veto. He can veto all at once. And the Speaker of the House was very fine with the remedies and rights he had as the Speaker of the House to deal with that issue. In fact, the legislature overrode those vetoes by a two-thirds majority. So we're not here bothering this court with matters that can be handled very easily between the executive and legislative branches. I'm not here to challenge any criticisms or comments by the governor that the marketplace of Reno free speech and the Speaker of the House is fully committed to robust speech on both sides, and he'll take his licks and he'll take his ability to counter those in the court of public opinion. So when the governor wrote a detailed letter on June 8th making harsh criticisms of the Speaker of the House, we have no complaint about that as an adverse action. When the governor said that Marquis beat his wife or that he was corrupt as sin, we're not here about that at all. We will deal with that in the public marketplace of ideas. Those are not reported. Even the termination is not an adverse action that we're challenging. The governor did not terminate Marquis. So that's not one of the adverse actions. There are only two adverse actions, and they're both things the governor did, not a third party. He pulled back. He rescinded. He put a stop order. He canceled $132,000. And the second thing he did was he very clearly, and very clearly to the point I think he even admits to it, threatened to withhold the rest of the over $1 million for a 100-year-old charitable, nonprofit, nonpartisan charity committed to helping at-risk children and youths become good citizens. Those are the only two adverse actions. My second set of concessions relates to state of mind. I admit, and if I lose because of this, so be it, that there are possible legitimate motives for the governor withholding funding. For example, he alleges corruption, financial corruption, lack of qualification, that perhaps being a one-feeder itself probably should be disqualifying some, if concerned at least. So there are legitimate reasons. But the case law of this court and the U.S. Supreme Court is very clear. That would destroy every race retaliation claim and every First Amendment retaliation claim if the mere possibility of an objectively plausible and legitimate nondiscriminatory motive would win the day. And certainly not a motion to dismiss. This court has held it contrary. Judge Bodine worded it very eloquently and concisely. This court has reiterated that several times, that for a motion to dismiss, and we're only going to motion to dismiss, I'm not asking to win anything today, that the motive is the one alleged by the plaintiff, as long as it means it's not too thin of a case. Too thin of a case. And no one should get thrown out, and this court has said that. And that's my third set of concessions is that we're not alleging that we're 100% clear that the jury's going to rule in our favor. The jury has to decide that, and there's all kinds of procedures to go down the road. This is a motion to dismiss. So I'm not claiming that you should decide that the improper motive of political affiliation retaliation was the motive, or even the most likely motive. All you have to decide today is that it's a plausible motive, which is much less than likely. It's just plausible. And at your circuit, I went and looked at Shepard's. You had the honor of having the most circuit court opinions apply in Bronte. You're number one. We have a close, somebody's a close second, I think, to 7-3rd. But you're number one. And your opinion, when you look at them, many of them find circumstantial evidence is enough, especially at this stage of the case, when you have a hyper-charged political environment and you have one political opponent taking an adverse action against the other. And then the facts get sorted out later. In this case, we have direct evidence of a very hyper-charged. I think in the history of Maine, I'm not aware of a government making the kind of statements that would veto every bill by a Democrat. Once again, I'm not complaining about that as an adverse action, but it's evidence of political affiliation discrimination motive. It's solely in the case as motive. So the governor can say those things all he wants, but it's relevant to this motive when he took the $132,000 back and when he threatened to withhold the rest, which are the only two adverse actions on Shepard. Can I answer? You said that the $132,000 was going to be taken from GWH. Now, I just want to understand exactly how this works, because I understand that the governor's authority to spend money that is allocated to DOE for miscellaneous educational services gives him the authority to spend money on the Center for Excellence. Now, it's the way that I understand it, and you tell me if I'm wrong, GWH then chose to implement the provision that says there would be a Center for Excellence by creating a charter school means. Is that right? The statute actually identifies Goodwill Navy as the only entity that's going to be the Center for Excellence. It actually calls it out and says you're going to be the one. So the statute actually comes up. Well, what I'm trying to understand is there are two things. GWH does things apart from the Center for Excellence, correct? A whole lot of things. Yes, okay, so that's point one. Point two, does the Center for Excellence do anything apart from means? I don't think so. I'm not aware of it. Okay, so my question then is when he pulls back that $132,000 from GWH, under the statute what he's pulling back is money that his authority spent on the Center for Excellence, which is means. So why is that wrong? It actually is the entity that receives the funds. But you just said GWH is distinct from the Center for Excellence because it does things that are not the Center for Excellence. In other words, well, I know it goes to GWH, but it's appropriate that the author has to be spent only for the Center for Excellence. I don't believe that's correct. The complaint is that he's the country and so is the independent. The statute, does the statute give him any authority to spend money on GWH apart from spending it for the Center for Excellence? It's just discretionary funding. Yeah. He can give it to Goodwill or not. It doesn't say that it has to go to means. No, it has to go to means. I thought it was, well, the statute references the Center for Excellence. It does not authorize spending for GWH apart from the Center for Excellence. Is that right? It actually identifies it as the recipient of the funds. Right. Insofar as it's different from the Center for Excellence. Isn't that right? It doesn't say that in the budget that appropriated the extra dollars that we're talking about. I'm saying the statute authorizes him to spend the money in the budget. That's what I'm asking about. Well, there's two sets of money, and the original funding has a formula that also goes to other schools. This is on top of that. And this is in a different provision. It didn't have to be there. It wasn't necessary. It was added because they thought that the school needed more time to scale this on two feet. It's Chapter 227. That's the discretionary funding we're talking about here. Correct. That's the original. That's the core money that keeps coming every year. The governor has discretion over that. It was the extra money. And that was for GWH in the budget. Maybe that's a different way. If Chapter 227 did not exist, would the governor be able to spend this money on giving it to GWH? Yeah, I think the legislature authorized to say you can spend money on this school. In the budget, regardless of the fact that it also – I mean, there's a connection. I don't think they're dependent on each other. No. It's a separate set of money. GWH runs a museum, right? Yes, a bunch of things. Could the governor spend the state funds that were appropriated to build a museum? Yes, in the sense of he could give the money to Goodwill Hinckley or not. And then it would go to Goodwill Hinckley. And the investigation that was non-biased, and we have the report in the records, found that Goodwill Hinckley did not spend that money on the charter school directly. It spent it on its own overhead, its own operating costs. So that it did not just – it didn't go to the charter school. It actually found that explicitly as a finding. So when a motion is dismissed, it's in a complaint that's supported by an independent, bipartisan, nonpartisan part of the legislature that investigated this and found those facts. So at this stage of the case, of course the governor can push on that, argue that, and maybe win on some of your judgment. But at this stage of the case, the money was going to Goodwill Hinckley, and it did not go – it actually says did not go directly to the charter school in the findings of the investigative report. Okay. Related question. Could you just explain to me the relationship between GWH and MEANS? Sure. Well, the White says – They say that there's a statute that makes GWH the authorizing or the authorizer for MEANS. Is that right? Yes. Okay. So what does it mean to – that's just a statute. So GWH is the authorizer for MEANS. Correct? Yes. So what does it mean to be the authorizer? What obligations do you have as the authorizer under MEANS law? Well, I guess the flip side of that is there's an independent school – it actually had to be separate from the charter school. So it required that the charter school have a separate board of directors, so it has a separate principal. So the law and the facts of the complaint make it clear that there is separation between Goodwill and Hinckley. I totally understand that. And the charter school – There's not a perfect separation. That's all I'm saying. No, it oversees it. So what does that mean? That's not – what do you – do you have anything in the record that tells us what it means? After you've authorized it, you're going to establish a contract. GWH has a contract with MEANS, right? Yeah. Well, there's a charter school where you make – you sort of agree to certain requirements to get the funding. And I believe that's really the state board that went to Goodwill-Hinckley. Does MEANS and GWH have a contract? Does GWH as the author, as in the MEANS, have a contract with MEANS? That's not in the records I'm aware of. Within the records, it has its own principal, its own board of directors, and the independent report said it's controlled by the charter school. It oversees a bunch of other programs. This is just one of those. It's been around for over 100 years, so it's definitely not the charter school here. It's got integrity and independence that completely transcend the charter school, which is the reason why – if I can just make this final point – that no reasonable official can think that the president of a 100-year-old nonprofit charity is subject to a political loyalty requirement. And that's the only exception that GWH recognizes and this court has recognized. And it's always for a public office, their official. That's in every quote-unquote loyalty. This court – only one time has this court ever even talked about it being a private entity, and that's the PrismaZona case, which is completely distinguishable because that entity – That's all in your briefing. You'll hear from Mr. Strowbridge. May I please report? This case raises a number of different constitutional issues, any one of which is sufficient to dispose of this case at the motion-to-dismiss stage. But the court may not actually reach any of the three independent bases for dismissing the claim, those being the fact that the retaliatory acts are government speech, that the allocation of funding falls within the policymaker exception where partisan or ideological considerations may influence the government's actions, and absent immunity. And the reason we're not reaching those questions is because qualified immunity is an easy decision in this case. The Supreme Court authorizes the courts to get directly to the question of qualified immunity as to whether any clearly established law prohibits the acts that are complained of. Before I get into that argument, I do want to address the point that Judge Barrett was pursuing with my friend on the other side. At page 64 of the appendix, which is our initial link down below, it lays out the statutory history. But there is no dispute in this case that the discretionary funding issue was for the Center of Excellence. And there is no dispute that the Center of Excellence is, in fact, being used. And you can see in the complaint itself, this paragraph, 78 of the complaint makes it clear that the discretionary funding that is an issue in this case was allocated completely for its work operating at the Center of Excellence for at-risk students. That is the state of the law. It is not an exclusive issue, in fact. And this attempt to kind of build a wall between Meehan's and Goodwill-Hinckley, I think is really just kind of a last-ditch effort to say in a complaint that cannot stay the claim purely. And to emphasize that point, and we make this point in our policy makers' section, the job description that is referred to in the complaint that was publicly released talked about the fact that the person who they were seeking would be the leader of both GWH and Meehan's. The announcement that Speaker Eves has received the job, which is also referenced in the complaint, says that he is leading GWH. Well, can you answer the same question I was asking you upon which is, what is the relationship between GWH and Meehan's? Because Meehan's does have a separate board and has a separate principal. GWH, as I have said, is the authorizer of Meehan's. And does the record show that there is a contract between Meehan's and GWH? I don't know if the record, I mean, the OK report, which you attached to, one of the splitting below, has an in-depth discussion about the analysis. I don't know, you can't tell me specifically whether there is a contract. The contract is not on the record. The contract is not on the record. But what is on the record, plainly, is that the position was advertised as being both the leader of both schools. There was overlap among the boards. These are all private employment, aren't they? They are client-owned C3s, but the money that is issued in this case is public. Are they public or private employment? They are client-owned C3s. They are not themselves public, but they are receiving public money to operate a public charter school. Does that make them a public employee? It means that when determining whether or not the acts with respect to the particular public funding that was issued here to accomplish a public activity, which was public education for a public charter school, makes it public for purposes. And Northway, for example, makes it clear that private contractors can perform public functions as a policy making a government exceptions can apply to the private contractor. Just so I get the limits of your argument, so many private universities operate charter schools. Many private universities operate charter schools. Okay. Is your position, then, that the governor of a state could make a condition of the university that in order to get funding for the charter school, it has to have the Republican or Democrat as the president? Our position is that the government, when it is providing, in this case, future discretionary funding, is free to make decisions about how it employs that future discretionary funding. So is the answer a yes or no? I guess your assumption is that the private university is receiving public money to operate the public charter school. If the answer to that is yes, then the government, regardless of party, is free to make decisions based on public policy concerns regarding the implementation of charter schools. And we don't need to know any more about the relationship between the university president and the operation of that charter school to conclude? We do need to know in some cases. If there was true independence, that would be fine. In this case, on the facts of the complaint, we have a clear relationship. What's true independence in your view? If there was no overlap between the boards, the leader of the chancellor of the university. I'm not real sure how to apply the hypothetical. Well, isn't the burden on you to show it's a policymaker? No, the burden is on you to show it's a policymaker. So unless you can meet that burden, you can't say it's a policymaker? No, that's not true. Unless we can, but the question in this case is whether it was clearly established by law. That's the qualified immunity. I understand that. If we chose to also decide the purpose of clarifying the law, the question of whether it was a violation, the burden would be on you, right? The burden would be on us initially to show that yes, it is in fact a policymaker. So how do you meet that burden here? In this case, we meet the burden from the facts of the complaint that I just referenced that made it clear that this position was advertised as being the leader of GWH and Meehan's. But the search committees, the Meehan's boards' extensive participation in the search committee process with the fact that the announcement was that the speaker would be the leader of both Meehan's and Google Hinckley, as well as the overlapping statutory requirements. And the fact that this specific funding, again, I think when you're assessing the claim for active retaliation, you've got to look at the nature of retaliation in this case. In this case, it's withholding unappropriated future funds that are specific and discretionary to the governor for the operation of the charter school. It should be noted that Meehan's receives more than $1 million of other state public education funding that is not discretionary, that is not specific to the Center of Excellence. And there's no allegation that there was any threat or there were any actions taken with respect to that funding. The funding in this case is only for the discretionary point. That leads me to the second point that I really must make. Before you go into that, can you just tell me what, in the complaint, did you propose for making this a policy, a public official that has to live up to policy, or establishes policy, I should say? We think that the allegation is the point that establishes that this position is policymaker. Can you tell me specifically what part of the complaint? Yeah, there's, I can give you citations if Ron would like. The job advertisement which is cited in paragraph 7. Job advertisement, what does it say? It says that the president will lead both Google and Maine Academy of Natural Sciences in a leadership role as one of the factors in determining whether someone is a policymaker. Well, but does it have to be policymaker, effective performance of the public office involved? Why is this a public office? The public office in this case is the operation of the charter school, which he does not, there is no dispute that Google and Maine operates Maine as the charter school. In fact, my friend on the other side has said that in writing to courts twice in this case. He said it below, you'll see it in page 100 of the appendix. And he said on page 17 of his opening brief to this court, GW operates Maine as, and that is the public office that we're talking about in this case. I'm sorry, I'm new to this case and you're going to have to help me a little more. No problem. What is the public office? I don't understand that. The public office in this case is the operation of the public charter school. That is the public role that in this case, that 510C3 is being asked to undertake. That is the governmental role operating the public school. And so the office in this case is who is in charge of managing, leading the operation of the school. So just so you can understand that, if we didn't have GWH in the mix, your position is that the principle of a charter school can be made to be a particular party? Our position is that the kind of criteria that illustrates the policy of the school. Can the principle of a charter school be made to be a political party? If it is a public charter school, then I don't know if the principle can, but certainly the superintendent of the school district is. I think in most cases the principle can be made. But the superintendent of the school district, that's not what we have here? I think it's actually more akin to that because, as you pointed out, GWH operates in a number of different functions. One of them is implementing the primary, one is implementing the secondary. The other ones aren't public functions at all? Setting that aside, in this case the only public function... Well, I understand the superintendent of the school district, but we never held it. I don't know of any cases that say the principle of a school can be selected on a partisan basis. All right. We cited several cases in our brief, including O'Connor. O'Connor in his previous talks about the provision and services of public schools. It's not specific to GWH, for instance. So is your proposition that having a charter school can be... funding for the charter school can be conditioned on whether it's Republican or Democrat? I think that, well, yes, although this Court has been clear that when it talks about the policy-maker exception, Republican and Democrat is a shorthand for important public policy goals. And when allegations have been complained, established that there was a heated debate in which both parties to this case were participants on opposite sides, as to the advisability of charter schools in the state and how their mission should be accomplished. So in this case, the answer to that is yes. And this Court has been clear that the policy-maker role does not necessarily require a high office. It's anyone who's involved in communications, reaching out, otherwise representing the school. And to go back to Judge Morello's question, in addition to the job announcement, it also talks about the duties to include the fulfillment and advancement of the mission of GWH and NEANS and its programs. It requires experience working with the legislators and state policy-makers, and one of the body's toughest superior communication and public relations skills in representing GWH and NEANS to its public and private constituencies. Those are all types of duties that are consistent with what this Court has said constitutes a policy-maker. Assuming there's a public office. Well, yes, but in this case, and again, Northlake is clear from the Supreme Court that private contractors who are contracted to perform public policy-making functions can be treated as such for the policy-maker section. Well, thank you. I do want to address this question about the alleged pooling back of funds. There is no dispute in the record, and the complaint concedes it, that these were discretionary funds that had yet to be appropriated. The budget-making process was still in the flows of the current state of the union time. The budget was later reviewed. The money in June, there wasn't the money to either appropriate or to provide to NEANS or to GWH. That was unappropriated funds. Any rule that basically suggests that it is an act of unconstitutional retaliation to fail to take a step to provide somebody with unappropriated funds would be extremely problematic. For no other reason than the fact that that's actually illegal in NEANS to provide funds that are not appropriated. So I don't think that could be the basis for a reasonable retaliatory act. Is that the only threat? That if there weren't, that there would be a penalty? Well, unless it's true that even if there were a penalty, you wouldn't spend them. Right. Well, and the way the record presents itself on the 12 to 6 measure. I think that would have to be a different question. The allegation of the point is that he pulled back payment of funds that were scheduled to go out. And vowed not to spend any money going forward. That's an implication that the complaint is drawing upon. But certainly our view is that. So what about that one? Well, as we made clear, I think it's the courts in Montgomery. Governments are free to make decisions based on policies to what they want to do with funds. Okay, but that's a different point, right? Well, that's a different point. I will say this in our absolutely new argument. It's clear that the Supreme Court in Logan, which was a case that came out of this part of the Supreme Court, was familiar with it. It was quite clear that budget-making activities, no matter at what point in the process. Let's hear a different point. Well, I'm sorry. I think that's the same point. I thought we talked. The question of whether he's trying to set the budget is one point. Right. The question of whether he's just trying to open up an expenditure that's one that he may have in the future. Then you rely on the policymaker's option, right? That's a different point. Fair. That's an additional point, yes. So if it's not a policymaker, and he was not saying I'm going to adjust the budget, then what he's threatening is funds that are available to me, I will not spend. If we want to ignore the legislative calendar and the conceded fact that no funds have been appropriated at this point, as we pointed out, we don't want to be the least case in the Third Circuit. It's clear that when the legislature has, even after the funds are appropriated, left to the discretion of the recipient of the funds how to spend them, it still constitutes budget-making, and absolutely we're going to be still harsh claims that arise from it. And there's a reason for that. Counsel, where is the actual language quoted in the complaint about what the governor said? There's a number of quotes in the complaint about what the governor said. I quote the letter that he issued. What did the letter say? The letter talked a lot about the speaker not being qualified for the job and having concerns about his prior opposition to church. That was sort of the gist of the letter. I thought you would help me with the actual language that was used as opposed to a characterization of the language. The letter speaks for itself. I think Mark claims that the letter is an act of speech, and I do not understand why I'm quoting this. He's specifically saying that the letter is not a basis for his claims, although it is in the complaint, and I think that he's trying to draw inferences from the letter for purposes of this case. The one point that I do want to make before my time runs out is the importance of the qualified immunity aspect. There have been no questions about that today, but I'm sure the Court understands how specific the Supreme Court is in requiring qualified immunity, and specifically suggests that the Court should think hard and think twice about reaching out to decide constitutional issues when the qualified immunity answer is clear. None of the cases that Mr. Reese decided, the speaker decided at any point in this case, come close to this type of particular factual specificity which requires qualified immunity. What do you say to the Moselle case? I'm sorry, which case? Moselle v. Howard. Is that the one from the Third Circuit after Saloga? That's a Supreme Court case, in which the Supreme Court said a violation that is, quote, so obvious that a reasonable person would have known about it is not entitled to qualified immunity. Let me just have a minute to address the question. That is the general principle, but of course that just raises the question as to what is the alleged obvious violation in this case. As we point out, Saloga, RC Maxwell, a number of other cases from other circuits, and no case from this Court comes close to suggesting that the actions here even violated the Constitution, let alone being the burden of clearly established law. And I will note that that's also true with respect to the policymaker function. We argued that below, and we certainly don't want to stay on that. The reason you shouldn't reach out to decide any of these questions is because if you decide more than one of the merits questions, you're going to have to reach all of the merits questions in this case. That's one of the reasons why, in Pearson, the Supreme Court said the Court should skip the second step, the second step would fall to an immunity. That's what we would ask the Court to do here. Thank you. Judge Lynch, you had a question. I just want to answer it. Paragraph 7 of the amendment complaint, it's really simple. Somebody asked the Governor, did you make the threat, and he said, yeah, I did. No, no, no, no, no, no, no, no. Go back to what the language was that was used with the JVH principles. Not the characterization later. Usually a motion to dismiss an admission by defendant is enough to get you passed out. So, Judge Baird, I did go back and look. Could you answer my question before you move on? I'm sorry. There's paragraphs and paragraphs of people talking. Yes, that is an actual language that he used. Some of it's profane. There's a lot of it, but he admitted it. That was the language of the threat. Why are you avoiding this question? Well, he admitted to it, so usually on a motion to dismiss we don't spend a lot of time on something. I cite the paragraph of the complaint, and it's the court that's underlying that, so I'll let the court decide whether paragraph 7 says that or not. So I apologize if it doesn't, but that's my good faith representation of the court. So what we have in the record is a representation by the funder about what the governor said to the funder? Yes. And did we have anything else in the complaint from the governor beyond what you said, which is that he conceded that he had made a threat? It was the president of Goodwill-Hinkley who came away with the exact same impression. So what's the complaint say about Goodwill-Hinkley's president at that time? He had a note, he had a conversation that led him to believe that the governor was threatening to withhold the 1.3 million. That's how he interpreted it. The exact same impression was created by the benefactor who was going to get $3 million from Goodwill-Hinkley and realized that the organization was going to be using a million. The question you asked about the contract, if you look in the appendix, on page 129, it goes through all this. It says the contract between the Maine Charter School Commission and means not Goodwill-Hinkley. So the answer to that is not Goodwill-Hinkley. So is GWH the authorizer under this charter? The charter statute says there's somebody who's an authorizer. Because it already existed and it was already an entity that was well-respected. That's the repository where the charter school got put, but it's not... The charter school is primarily run according to page 140 of the appendix. By the board of directors of the charter school and its principal. So there's a major layer of independence that's required, actually, by the provision. And secondly, it is not the public charter school. The statute I cited in my final brief is a private charter school. So again, your position is that there's no legal obligation of GWH with respect to means? Well, it's part of means. I mean, it means overseas. I don't want to overstate the definition, but here's the point. It's a private school. Just because a private school gets money doesn't make it appropriate for partisan affiliation. I mean, that's fine. I'm just trying to say what the legal relationship is between GWH and means. If the point you're trying to make is we can't tell yet on this record, that's fine, but you are conceding that GWH operates means. Yes? That's what you're complaining. In an umbrella fashion, but it's more correctly controlled by and operated by the board of directors and the principal of the charter school. And just last question, sir. Could you add any context since your complaint says GWH operates means? What do you understand the word operate to mean? Functionally, what does that mean GWH does with respect to means? I mean, it generally oversees it among other operations, but delegates most of the day-to-day operations and the day-to-day control to a separate board of directors and a separate principal. And also, the money went to a place in the independence grounds, so it did not go to the charter school with the money we're talking about. Thank you very much. Thank you both. Thank you.